Argued and submitted December 19, 1994, reversed and remanded March 22, 1995

Tammy Jo WALKER
and Sherri Marshall,
Co-Personal Representatives of
the Estate of Debby Norman, Deceased,
*Appellants,*

*v.*

Bryce MITCHELL
and Barbara Mitchell,
husband and wife,
Robert McMenamin,
Personal Representative of
the Estate of Jerry Merin,
*Defendants,*

*and*

STATE OF OREGON,
by and through the
DEPARTMENT OF TRANSPORTATION,
Aeronautics Division,
*Respondent.*

(CV92-368; CA A83390)

891 P2d 1359

Susan D. Marmaduke argued the cause for appellants. With her on the briefs were J. Richard Urrutia and James, Denecke & Harris.

John T. Bagg, Assistant Attorney General, argued the cause for respondent. With him on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

Before Deits, Presiding Judge, and Riggs and Haselton, Judges.

HASELTON, J.

## HASELTON, J.

Plaintiffs in this wrongful death action appeal from a summary judgment for defendant State of Oregon, granted on the grounds that the State Aeronautics Division had not acted negligently and that, in any event, the division was immune from liability. We reverse and remand.

Plaintiffs' decedent was a passenger in a small airplane that crashed shortly after taking off from an airstrip at the Flying M Ranch, a restaurant and resort facility near McMinnville. Decedent died from injuries sustained in the crash, and plaintiffs subsequently brought this wrongful death action against the state and other defendants, including the owners of the Flying M Ranch. In their complaint, plaintiffs alleged that the Aeronautics Division was responsible for certain dangerous conditions that caused the crash, in that: (1) the Flying M Ranch airport was open to and frequently used by members of the flying public; (2) the division was aware of that fact; (3) the division nevertheless registered the Flying M Ranch's airport as a "personal use" airport,[1] thereby exempting it from the dimensional standards, including standards governing runway length and "glide slope,"[2] applicable to "public use" airports; and (4) the division's failure to require conformity with those standards contributed to the crash, in that certain conditions that prevented decedent's plane from effecting a safe departure, including a group of trees near the east end of the airstrip, would not have been present if the airport had complied with those standards.[3]

---

[1] The division's regulations provide two definitions of "personal use" airport. One definition, OAR 738-20-015(2)(a), hyphenates the term "personal-use." The other, OAR 738-20-015(1)(c), does not. For the sake of consistency, we refer to both definitions by the unhyphenated term.

[2] Glide slope is the angle of unobstructed approach (or departure) measured from the edge of a landing and take-off area to the end of a designated "approach and departure zone."

[3] There is some evidence that the Flying M airport did not conform to the relevant property width and length standards. Plaintiffs' principal argument, however, concerns the airport's failure to conform to a 20:1 glide slope standard specified in the rules. Plaintiffs maintain that, because the flight path from the airport was obstructed by trees, its glide slope was twice as steep as the 20:1 standard. Plaintiffs further maintain that the decedent's death was caused by her pilot's inability to clear those trees.

The state moved for summary judgment, arguing that the dimensional safety standards, upon which plaintiffs' claims rested, pertained only to public use airports and that the division had correctly determined that the Flying M airport was a personal use, rather than a public use, airport.

The state further asserted that, even if it had somehow erred in classifying the Flying M strip as a personal use facility, it was immune from liability under various species of immunity, principally "discretionary function" immunity. ORS 30.265(3)(c). Plaintiffs countered by arguing that the question of whether the Flying M airstrip was a personal use airport under applicable regulations turned on disputed issues of fact. In particular, plaintiffs pointed to evidence that the airstrip was frequently used by persons other than the Flying M's owners; that the owners described their airport as open to the public and advertised it as "welcoming pilots"; and that division employees were aware of those facts.[4] Plaintiffs also contended that the state had failed to prove the predicates for immunity, especially discretionary function immunity. *See, e.g., Stevenson v. State of Oregon*, 290 Or 3, 619 P2d 247 (1980).

The trial court granted the state's motion for summary judgment, finding that the division

"properly classified and registered the Flying M Ranch Airport as a personal use airport and in so doing exercised a discretionary function by reason of which, if it erred, it is immune from liability."

■ Plaintiffs' appeal thus presents two principal issues. First, viewing the facts most favorably to plaintiffs,[5] was the

---

[4] Plaintiffs relied particularly on the deposition testimony of a division Air Operations and Safety Officer, who had inspected the airport:

"Q: * * * From your own information or inspections out there, were you able to gather any facts which led you to believe that it was open to the public or led you to believe that it wasn't open to the public?

"A: Conversations with the owner, I would say that there were people coming in frequently. * * * I would run down and say let me check all of this information; and then checking down through the information, when I said, is this open to the public?; he would say, 'Open to the public.'

"Q: The owner would?

"A: Yes."

[5] In reviewing a summary judgment, we determine whether, viewing the facts

Flying M airstrip a personal use airport under the applicable regulations? Second, regardless of the propriety of the Aeronautics Division's treatment of the Flying M airstrip as a personal use airport, or the susceptibility of that issue to summary judgment, was the division immune from liability for that designation?[6]

We turn first to the personal use versus public use issue. Under a division rule, any airport

"that is open to the public shall conform as a minimum to the design and dimensions of General Aviation Airports shown on the drawing 'Minimum Standards for General Aviation Airports' attached as Exhibit '1' hereto. Airports for personal, recreational or emergency use, if not so conforming, may be approved if runway and approaches are adequate for the published operating characteristics and limitations of the aircraft to be accommodated[.]" OAR 738-20-020(1)(a).[7]

Thus, if the Flying M airport was "open to the public," it should have conformed to the referenced dimensional standards. Conversely, if it was an "airport[] for personal * * * use," it could be operated without complying with those standards.

Plaintiffs maintain that the Flying M was not correctly categorized as a personal use airport. They rely on the definition of "personal use airport" found in OAR 738-20-015(2)(a), which provides, in part:

"(2) Types of Airports—By Use:

"(a) 'Personal-Use Airport': As used in this rule means an airstrip restricted, except for aircraft emergencies, to use by the owner and, *on an infrequent and occasional basis, by*

---

and reasonable inferences most favorably to the nonmoving party, the moving party has established that there is no issue as to any material fact and that that party is entitled to judgment as a matter of law. *Seeborg v. General Motors Corporation*, 284 Or 695, 699, 588 P2d 1100 (1978).

[6] The state asserts a third, and alternative, basis for affirming the summary judgment: Even if the division misclassified the Flying M airstrip and is not immune from liability for that determination, the alleged error in classification could not have caused or contributed to the crash. That argument is addressed *infra*. 133 Or App at 576.

[7] The referenced drawing includes standards for property length and width and glide slope.

*his invited guests*, and to commercial activities in connection with agricultural operations only." (Emphasis supplied.)

Plaintiffs argue that, because the Flying M's airport was used *frequently* by persons other than the airport's owner (notably, by persons using the ranch's recreational facilities or otherwise visiting the ranch on business), it cannot properly be classified as a personal use airport. At the very least, they contend, the evidence of extensive nonagricultural, commercially related use precluded summary judgment on the propriety of the division's classification.

The state responds that the frequency of use was immaterial because the definition plaintiffs invoke is inapposite to their claims. The state contends that the operative definition is set out at OAR 738-20-015(1)(c):

"(c) 'Personal Use Airport': A designated area where all aircraft must be owned or controlled by the owner of the airport and non-based aircraft must have the permission of the airport owner to land."

The state differentiates between the two definitions of personal use airport within the same regulation by positing a qualitative distinction: (1) paragraph (1)(c) is a "safety" definition, which applies in determining whether a particular facility is subject to the regulatory dimensional standards, including those underlying plaintiffs' claims; and (2) paragraph (2)(a) is merely and exclusively a "land use" definition, which exists solely for land use control purposes, and is merely a statement "that the airport owner is responsible for control of the facility and a limitation on intensity of use."

Thus, the personal use classification issue reduces to a question of which definition controls.[8] Before addressing the merits of that issue, we note that the state does not invoke on appeal the familiar principle that we are to defer to an agency's plausible interpretation of its own rules so long as that interpretation "cannot be shown either to be inconsistent with the wording of the rule itself, or with the rule's

_____

[8] If the state is correct that the paragraph (1)(c) definition controls, plaintiffs do not meaningfully dispute that the Flying M airstrip falls within the terms of that definition. Conversely, if the paragraph (2)(a) definition applies, there is a factual issue as to whether the division properly registered the Flying M airstrip as a personal use airport.

context, or with any other source of law." *Don't Waste Oregon Com. v. Energy Facility Siting*, 320 Or 132, 142, 881 P2d 119 (1994). That is unsurprising because there is no evidence in this record that the division actually interpreted OAR 738-20-015, or applied a previous interpretation of that rule, either in originally registering the Flying M Ranch as a personal use airport or in subsequent reapproving that status. In particular, in moving for summary judgment, the state adduced no proof that the division had *ever* used the paragraph (1)(c) definition, rather than the paragraph (2)(a) definition, as the basis for its approval of a facility as a personal use airport—much less that it did so with respect to the Flying M airstrip. In a related sense, the state presented no evidence that the division had ever, before this litigation, interpreted OAR 738-20-015 in such a way as to draw the distinctions that the state now argues exist between paragraphs (1)(c) and (2)(a).

We begin, then, with the text and context of the regulations. *Perlenfein and Perlenfein*, 316 Or 16, 20, 848 P2d 604 (1993). The texts of paragraphs (1)(c) and (2)(a) do not expressly state that they are limited, respectively, to safety/dimensional or land use contexts. Nor are we persuaded by the state's efforts to imply such an intent from the text. Although it is true that paragraph 2(a) uses some land use-like language to define personal use airports,[9] it also includes "safety" terms.[10]

Moreover, when we examine the division's rules as a whole, we cannot discern any meaningful pattern by which they refer to subsection (1) definitions for dimensional/safety purposes, and to subsection (2) definitions for land use purposes. For example, OAR 738-20-020(1)(a), which governs

---

[9] For example, "occasional," as used in paragraph (2)(a), is to be determined by reference to "compatibility with the existing uses of the surrounding area." OAR 738-20-015(3)(j).

[10] For instance, "controlled," as used in paragraph (2)(b), is later defined to mean

"supervised or regulated by the airport owner in such a manner as to:

"(A) Reasonably minimize disturbance, by aircraft operations, to persons and property in the vicinity of the airport; and

"(B) *Reasonably insure that all users are fully aware of conditions, limitations, and possible hazards which may exist at the airport.*" OAR 738-20-015(3)(f). (Emphasis supplied.)

compliance with dimensional standards, refers to "an airport that is open to the public" — a term that is not defined by any regulation and that could correspond to a "General Aviation Community Airport," under OAR 738-20-015(1)(b), to a "public-use airport," under OAR 738-20-015(2)(b), or to both.[11] *See supra*, 133 Or App at 569. Moreover, the term "public-use airport," which is a land use term under the state's methodology because it is defined in subsection (2), appears at least once in a section of the rules that is devoted entirely to dimensional standards.[12] Thus, the regulatory context of the rules, as presently configured, is inconclusive and perhaps inscrutable.

We turn next to the historical evolution of OAR chapter 738. That history shows that, until 1989, chapter 738 included only one definition of personal use airport: the definition now found at paragraph (2)(a).[13] Then, as now, OAR 738-20-020(1)(a) provided that "personal use airports" could be approved without comporting with the designated design and dimension standards set out in Exhibit 1 to the regulations. Consequently, at least until 1989, personal use airports, for purposes of exemption from dimensional/safety standards, were defined by reference to what the state now characterizes as exclusively a land use definition. Moreover, that definition was the only definition that existed for the

---

[11] Under OAR 738-20-015(1)(b), a "General Aviation Community Airport" is

"[a] designated area for the take-off and landing of aircraft which is designed for public use by general aviation, and where aircraft service facilities are normally provided and student instruction can occur on a routine basis[.]"

Under OAR 738-20-015(2)(b), a "Public-Use Airport" is

"[o]pen to the flying public considering performance and weight of the aircraft being used. May or may not be attended or have services available."

If the state's dichotomy between dimensional/safety and land use definitions were correct, one might expect OAR 738-20-020(1)(a) to use subsection (1)'s "General Aviation Community Airport" terminology. But it does not.

[12] *See, e.g.*, OAR 738-20-020(1)(b), which provides, in part:

"Sponsors of public-use airports shall have control of approach-departure zones with dimensions appropriate to the purpose and usage of the airport, but in no case extending less than 1,100 feet from end of the runway."

[13] Until 1989, OAR 738-20-015(1) included four "dimensional" definitions: "General Aviation Recreation/Emergency Airstrips," "General Aviation Community Airports," "Agricultural Airstrips," and "Heliports." OAR 738-20-015(2) included three "use" definitions: "Public-Use Airports," "Limited Public Use Airports" and "Personal-Use Airports."

purpose of determining whether an airport was required to obtain a license, or merely to register with the division, to operate.[14]

In 1989, the division amended chapter 738 to add the paragraph (1)(c) definition. There is no indication that that amendment was intended to negate any existing application of the (2)(a) definition, or to confine it to land use applications. Our best reading of that amendment is that it was intended only to complete a list of definitions that cross-refer to Exhibit 1, not to vary the long-standing application of the paragraph (2)(a) definition. Our construction is buttressed by the implications of the state's contrary reading. Under the state's reading, the paragraph (2)(a) definition pertains solely to the applicability of the dimensional standards, but is inapplicable for any other purpose, including the division's licensing/registration requirements. Thus, in the state's view, the Flying M airstrip could be a public use airport for licensing purposes, but a personal use airport for safety/ dimensional standard purposes. That dichotomy would seem irrational.

■    We thus conclude that the paragraph (2)(a) definition of personal use airports is not limited to the land use context. That definition pertains to the safety and dimensional standards at issue in this case.

■    On this record, there is a disputed issue of fact as to whether the Flying M airstrip was a personal use airport under OAR 738-20-015(2)(a). As noted, plaintiffs proferred evidence that the airport was frequently used by persons other than its owners, and that the division was aware of that

---

[14] The regulations' only reference to personal use airports, other than the reference at issue, is at OAR 738-20-030(2). Under that provision, no person may operate a public use airport without a license issued by the division. Personal use airports, on the other hand,

"are exempt from licensing, but sponsors will be required to register such airports annually with the Aeronautics Division. There shall be no fee for registration, but the owner shall register the airport prior to February 1 of each year on a form furnished by the Division. New airports shall be registered within thirty days of completion of the airport in accordance with plans submitted for site approval and approved by the Aeronautics Division. These airports may be approved for use by aircraft whose published manufacturer's specifications state they can be operated from an airport of a size less than the state minimum standards."

fact.[15] Thus, the propriety of the division's classification of the Flying M airstrip as a personal use facility was not susceptible to summary judgment.

We proceed to the trial court's alternative basis for summary judgment—that the division was immune from liability for any alleged misclassification, under the discretionary function exception to the state's general waiver of tort immunity. That exception provides immunity from liability to public agencies for

"[a]ny claim based upon the performance of or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused." ORS 30.265(3)(c).

In *McBride v. Magnuson*, 282 Or 433, 578 P2d 1259 (1978), the court explained that, for purposes of ORS 30.265(3)(c), discretion

"involves 'room for policy judgment,' or the responsibility for deciding 'the adaptation of means to an end, and discretion in determining how or whether the act shall be done or the course pursued. It involves the delegated responsibility for 'assessment and ranking of the policy objectives explicit or implicit in the statute' and for the judgment that one or more of these objectives will be served by a given action." 282 Or at 437. (Citations omitted.)

The state contends that the division's decision to approve the Flying M Ranch as a personal use airport involved precisely the type of discretion discussed in *McBride*. It proposes that, because the division's rules defining public and personal use airports are unclear, they leave the division with some discretion in interpreting and applying them in close cases. The state argues that this was such a close case. In particular, the state contends that the division's classification of the Flying M airstrip expressed and effected a policy choice to promote aviation rather than public safety:

"[T]he agency's choice to register the airport [as a personal

---

[15] The state argues vigorously that the fact that people were "coming in frequently" is perfectly consistent with a business invitation limited to persons using the ranch's commercial services and, therefore, is consistent with a personal use airport classification. That argument ignores OAR 738-20-015(2)(a)'s express limitation of "commercial activities" to those "in connection with agricultural operations only." The state does not argue, nor could it credibly, that use of the Flying M's restaurant, lodging, and recreational amenities constituted "agricultural operations."

use airport] relieved the owner from the possibility of having to close the airport or suffer the expense of bringing the airport up to community airport standards. This action promoted this small, aviation related commercial enterprise consistent with the legislature's announced policy of promoting aviation generally. Had the division chosen to classify the airport as a community airport open to the public for any purpose, licensing would be required as would adherence to the higher dimensional standards of an airport open to the public. In doing so, arguably, the division would have promoted public safety, but it would have done so at the risk of losing this and perhaps other small aviation related enterprises. * * * [Consequently,] the division's choice not to inhibit this aircraft related business represents a policy decision to promote limited, private airport uses over imposing requirements that might end the use while arguably promoting a higher level of public safety."

The difficulty with that plausible sounding argument is that there is no evidence in this record that the division did, in fact, weigh or act on such considerations in classifying the Flying M airstrip. Nor is this a circumstance where it is clear from the statutory and regulatory framework and the nature of the agency's decision that that decision *necessarily* involved the "assessment and ranking of the policy objectives." *McBride*, 282 Or at 437; *accord Stevenson*, 290 Or at 14.[16]

We cannot tell from the record how the division made its original decision to approve the Flying M Ranch as a personal use airport. Moreover, the only evidence pertaining to the division's yearly reapprovals of personal use status indicates that those reapprovals were devoid of discretion. Accordingly, we cannot agree with the trial court that, on this record, the division's decision to approve and register the

---

[16] *Stevenson* offered the example of a decision to repave only one of two sections of highway in need of repair:

"The appropriate agency might decide, for example, that its budget would permit the repaving of either of two sections of a highway but not both. The decision to repair one rather than the other would not be grounds for tort liability if made in the deliberate exercise of the agency's authority to set such priorities. The discretionary function immunity would not, however, necessarily insulate the agency from liability for the negligent performance by its employees of certain tasks related to such a decision—for example, determining the extent of the actual disrepair in each section and the kinds of hazards that existed as a result." 290 Or at 15.

Flying M Ranch as a personal use airport qualified for discretionary function immunity.

■ The state next argues that, even if the reasons stated by the trial court for granting summary judgment were erroneous, we should nevertheless affirm on the alternative ground that the division was immune for any misclassification under the "mistaken application of the law" exception to the general waiver of tort immunity. That exception provides that the state is immune from liability for

"[a]ny claim arising out of an act done or omitted under apparent authority of a law, resolution, rule or regulation which is unconstitutional, invalid or inapplicable except to the extent that they would have been liable had the law, resolution, rule or regulation been constitutional, valid and applicable, unless such act was done or omitted in bad faith or malice." ORS 30.265(3)(f).

The state reasons that any failure to enforce safety requirements, including the glide slope standard, ultimately flowed from the division's application of OAR 738-20-015(1)(c), a regulation that was, in retrospect, "inapplicable."

We are not persuaded by that reasoning. There is nothing in this record establishing that the division did, in fact, rely on paragraph (1)(c) in originally classifying the Flying M airstrip and in repeatedly reapproving the Flying M's applications.

■ Finally, the state urges us to affirm on the alternative basis that there was no causal relationship between the division's alleged negligence and the plane crash. That argument was raised in the codefendants' motion for summary judgment, in which the state joined, and which the trial court denied. From our review of the record, there are disputed issues of material fact with respect to causation, precluding summary judgment on that issue.

Reversed and remanded.