Argued and submitted October 9, 2019; reversed and remanded May 12;  on respondent's petition for reconsideration filed June 16, and appellant's response to petition for reconsideration filed June 18, reconsideration allowed by opinion August 11, 2021
See 313 Or App 802, 492 P3d 1292 (2021)

Bernadette BOX,
Personal Representative of
the Estate of Robert Clinton Box,
*Plaintiff-Appellant,*

*v.*

STATE OF OREGON,
Department of Oregon State Police,
*Defendant-Respondent.*

Josephine County Circuit Court
16CV13330; A166624

492 P3d 685

Oregon State Police (OSP) troopers shot and killed Robert Box outside his home. Plaintiff, the personal representative for Box's estate, brought this wrongful death action against defendant State of Oregon, alleging claims for negligence and trespass. Before trial, plaintiff moved for partial summary judgment on her trespass claim, arguing that the OSP troopers were trespassers as a matter of law. Defendant opposed plaintiff's motion and moved for summary judgment against all of plaintiff's claims. The trial court denied plaintiff's motion and granted summary judgment to defendant. With respect to the negligence claim, the court concluded that plaintiff's ORCP 47 E declaration was sufficient to controvert the allegations of defendant on the elements of negligence and causation. However, the court ultimately concluded that both the negligence and trespass claims were barred by apparent authority immunity. Plaintiff appeals, first assigning error to the court's grant of summary judgment to defendant, and, second, to the court's denial of plaintiff's motion for partial summary judgment. Defendant cross-assigns error to the court's conclusion that plaintiff's ORCP 47 E declaration was sufficient to create issues of fact as to negligence and causation. *Held*: The trial court erred in granting summary judgment to defendant. Apparent authority immunity does not apply to plaintiff's claims because there is no evidence that the troopers or OSP actually relied on the laws in question when they engaged in the allegedly negligent or trespassory conduct. As to defendant's cross-assignment of error, the court did not err in giving effect to plaintiff's ORCP 47 E declaration, and, in any case, there is sufficient evidence in the record to create an issue of fact as to whether the allegedly negligent conduct caused Box's death. Lastly, the troopers trespassed as a matter of law when they entered areas of the Box property where they lacked privilege or consent to do so. Therefore, the court erred in denying plaintiff's partial motion for summary judgment.

Reversed and remanded.

Pat Wolke, Judge.

Janet M. Schroer argued the cause for appellant. Also on the opening brief were Mark Sherman and Hart Wagner LLP. Also on the combined reply and answering brief on cross-assignment were Hart Wagner LLP; David D. Park and Elliott & Park; and Richard D. Adams and Rogue Law Firm PC.

David B. Thompson, Assistant Attorney General, argued the cause for respondent. Also on the briefs were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Shorr, Presiding Judge, and James, Judge, and Landau, Senior Judge.

SHORR, P. J.

Reversed and remanded.

**SHORR, P. J.**

Plaintiff is the personal representative for the estate of Robert Box. Box was shot and killed by Oregon State Police troopers outside his home. Plaintiff brought this wrongful death action against defendant State of Oregon, alleging that its troopers, West and Smyth, were negligent in their tactical approach to Box's home, and that the Oregon State Police (OSP) negligently supervised and retained Smyth. Plaintiff also alleged that the troopers trespassed on the Box property.

Before trial, plaintiff moved for partial summary judgment on her trespassing claim, arguing that, as a matter of law, the OSP troopers were trespassing on Box's property at the time and place of the shooting. In addition, defendant moved for summary judgment against all of plaintiff's claims. Plaintiff responded that there was a genuine dispute of material fact as to each element of her claims and presented evidence in support of that assertion, including an ORCP 47 E declaration asserting that plaintiff's counsel had retained a qualified expert whose testimony would create issues of material fact as to the issues of negligence and causation. The trial court denied plaintiff's motion for partial summary judgment and granted summary judgment for defendant. The court concluded that plaintiff's ORCP 47 E declaration created a disputed issue for trial on the negligence claim but granted summary judgment to defendant on the ground that defendant was immune from liability under the doctrine of apparent authority immunity.

Plaintiff appeals, raising two assignments of error. In the first, plaintiff contends that the trial court erred in granting defendant summary judgment after concluding that defendant was entitled to apparent authority immunity. In the second, plaintiff assigns error to the court's denial of plaintiff's motion for partial summary judgment, arguing that the troopers were trespassers as a matter of law. Defendant cross-assigns error to the court's conclusion that plaintiff's ORCP 47 E declaration was sufficient to defeat summary judgment on the negligence claim. For the reasons explained below, we conclude that the trial court erred in granting summary judgment to defendant and in denying

partial summary judgment to plaintiff. Consequently, we reverse and remand.

## I.   PLAINTIFF'S ALLEGATIONS AND THE EVIDENCE PRESENTED ON SUMMARY JUDGMENT

Before turning to the evidence presented on summary judgment, we provide a brief overview of plaintiff's claims for negligence and trespass. Plaintiff's claims arise from the troopers' entry onto the Box property, and eventual shooting of Box, who was armed at the time of the shooting. Plaintiff alleged two specifications of negligence. In the first, plaintiff alleged that Smyth was predisposed to dangerous performance deficiencies, including tunnel vision in stressful circumstances; the supervising and commanding OSP officers were aware of Smyth's stress-induced performance deficiencies; and the supervising officers negligently retained, supervised, and trained Smyth in light of the danger posed by those performance deficiencies. In the second, plaintiff alleged that Smyth and West, who went to the Box property in response to a reported assault, were negligent in their tactical approach to the Box property and in failing to properly notify Box of their presence. Plaintiff alleged that the troopers' negligence created conditions—significantly Box's possession of a gun at the time of the shooting—where the use of lethal force became probable and caused Box's death. Plaintiff's claim for trespass alleged that, during the troopers' approach, and at the time of the shooting, the troopers entered areas of the Box property without authority or consent to enter.

We turn to the record before the trial court at the time of summary judgment. On review of a grant of summary judgment, we view the record in the light most favorable to, and draw all reasonable inferences in favor of, the nonmoving party. *Jones v. General Motors Corp.*, 325 Or 404, 413, 939 P2d 608 (1997). Because we first address the court's ruling on defendant's motion for summary judgment, we begin by stating the facts in the light most favorable to plaintiff.

### A.   *Supervision and Retention of Smyth*

We begin with the evidence that is relevant to the alleged negligent supervision and retention of Smyth. Smyth

was hired as a trooper for OSP in 2008. In 2009, a personnel complaint was sustained against Smyth after he operated his patrol car "in an unsafe manner" while responding to West's request for backup due to a "combative subject." Smyth "drove in excess of 100 miles per hour" on a city street with a speed limit of 30 to 35 miles per hour. Smyth also failed to stop at a red light and drove "into the opposite lane of travel at two different intersections." Smyth told the investigating sergeant that, "when he heard Trooper West say that she had a combative subject[,] he was so focused that he did not hear her say" she no longer needed assistance or hear her talking with another trooper on the radio. Smyth stated that he remembered thinking about "images" of police officers "losing their lives or coming close to it" during his response.

In 2013, Smyth joined OSP's SWAT team, a position he held in addition to his OSP patrol duties. Sergeant Glass was Smyth's SWAT supervisor. During Smyth's tenure on the SWAT team, Glass received five written complaints from Smyth's peers and training officers about Smyth's performance during training exercises. One complainant noted that, "[t]hroughout the day," Smyth "was in a heightened state and seemed to be on edge constantly, and appeared unable to calm down. This definitely seemed to negatively affect his ability to properly and safely process information as it was presented to him." Another described Smyth as being "so focused on the downed threat, he did not perceive anything else that was going on." During that training, a team member "had to physically go get him *** to move to a position of cover" with the rest of the team. This reflected Smyth's tendency "to get overwhelmed with a lot going on" and "tunne[l] in on one problem[,] leaving him and [his] teammates open to other conditions that are just as important." One complainant wrote that Smyth's "decision making and overreaction have the potential to lead to someone being seriously injured, or killed, on a real world operation." The other complaints were also consistent in describing Smyth's performance issues. Each involved Smyth repeatedly demonstrating problems processing information, moving forward with operations while failing to account for safety concerns, and reacting to stress by "going into a 'tunnel vision mode'

that causes him to either overreact, or to react inappropri-ately, to the given set of circumstances."

Glass also personally observed Smyth's performance deficiencies. Glass observed that Smyth "was not as calm as he should have been" and that he "over processed informa-tion, which made him make mistakes." Glass testified that it is important for troopers to maintain calm in "high risk situations, so that they can process information." Smyth's behavior was a "safety hazard" because he tended to bypass threats.

Glass discussed his concerns with Lieutenant Fugate, who decided to terminate Smyth from the SWAT team as a result of the performance deficiencies observed during the SWAT trainings. Fugate understood Smyth's issue as a reaction to stress during which Smyth experienced an inability to see and hear things and was "focused on try-ing to get from Point A to Point B." Fugate understood that Smyth's tunnel vision could be dangerous to fellow troopers and members of the public.

After Smyth was terminated from SWAT, he retained his position as an OSP patrol trooper. Neither Glass nor Fugate reported the reasons for his termination or infor-mation about his performance to Smyth's patrol supervi-sors. Glass thought it might be important for Smyth's patrol supervisors to know of the reasons for Smyth's termination, but did not take action to inform them because his "chain of command would dictate [that his] lieutenant do that." Fugate believed it would have been common practice to communicate with Smyth's patrol supervisors regarding the reasons for his termination, but he did not remember having any conversations to that effect.

Sergeant Proulx was Smyth's direct supervisor at the time of the shooting. Proulx was not told of the reasons for Smyth's removal from SWAT. Proulx was unaware that Smyth had difficulty processing information in a stressed or heightened state. Lieutenant Altman participated in Smyth's 2015 performance review, and was unaware of Smyth's past performance issues, responses to stress, or tunnel vision deficiencies at the time of Smyth's performance review. Altman did not review Smyth's entire personnel file

as part of Smyth's performance review. Lieutenant Lux, also an indirect supervisor, "signed off" on Smyth's performance reviews. Lux had no knowledge of the complaints that led to Smyth's removal from SWAT.

OSP's fitness for duty evaluation policy lists the following indicators, among others, that may necessitate a fitness for duty evaluation: "[a] pattern of performance problems unresponsive to corrective measures and inappropriate for discipline or termination"; or "[o]ther observed or reported conditions reasonably raising the question of an employee's continuing psychological or physical suitability to carry out essential job functions." The policy provides that, when an employee's behavior "raises the possibility" that a fitness for duty evaluation is needed, the supervisor should immediately confer with the Office of Professional Standards. Smyth's supervisors did not raise the possibility that Smyth's behavior may warrant a fitness for duty evaluation with the Office of Professional Standards.

B.  *Evidence Relevant to the Troopers' Tactical Decisions and Training*

As we discuss below, this case arises in part from Smyth's and West's response to a 9-1-1 call made to the Josephine County Sheriff's Office regarding a domestic assault at the Box property. OSP provides limited assistance to Josephine County in responding to emergency calls. OSP troopers are directed to respond to calls where there is an "imminent risk of harm to an individual," which includes domestic violence calls that are "in progress." OSP troopers assisting in Josephine County did not receive additional training. Smyth testified that he could not remember the last time he had received training in the search and seizure of private homes.

Proulx testified that OSP troopers are trained to discuss a response plan when responding to calls as a team. That plan should include which officer is the lead officer, where to position vehicles, and how the officers will enter the property.

Plaintiff also introduced several documents that are used by OSP in its trooper training program. The Domestic

Disturbance training document warns that domestic distur-
bance calls are high risk and directs troopers to "[d]evelop
[an] action plan while enroute to [the] call." Among other
things, troopers on domestic disturbance calls are directed
to "[c]onsider phone contact" to bring subjects outside, and
to "[n]ever rush in" when entering a residence. The Contact
and Cover training documents emphasize the tactical
importance of designating a contact officer and cover offi-
cer when responding to a call. "The object of 'Contact and
Cover' is for the cover officer to discourage any assaults on
the contact officer." The contact officer "[d]irects the scope
of the contact and actions of suspects" and "may also direct
positioning of [the] cover officer." The cover officer "devotes
full attention to suspects through a position of surveillance
and control." Typically, the contact officer is the officer who
initiates the activity, and the contact officer "should make it
clear to the other officer that he or she is the cover officer."
According to the training, two common mistakes are when
"[t]he primary/contact officer does not communicate what he
wants from the cover officer" and "[t]he cover officer loses
concentration."

         Both troopers testified that, when responding to
domestic violence calls, it was common to use a stealth
approach. Smyth testified that he was aware of the follow-
ing tactics to reduce the risk of lethal force: keep distance
from the suspect if appropriate, seek hard cover, contact the
suspect by phone, and consider whether suspects may be
armed.

C.  *The Box Property*

         We turn to a discussion of the facts regarding Box
and his property. Box, his wife, Bernadette, his daugh-
ter, Kelsey, and his daughter's girlfriend, Megan, all lived
together in the house on the Box property. The property
is adjacent to Fir Canyon road. A driveway leads from Fir
Canyon into the Box property. The driveway leads directly
into a large dirt clearing. The house is to the right of that
clearing.[1] The front of the house faces Fir Canyon, and, at
the end of the driveway to the right side, there is a ramp that

---

[1] The description of the property is from the viewpoint of a person approach-
ing from Fir Canyon via the driveway.

leads to the front porch. To the back of the clearing, there is a detached workshop. A covered patio is attached to the back of the house. To the left of the clearing, there is another private driveway that connects to a common driveway that is shared by neighboring properties. The front of the house is not visible from Fir Canyon because it is obscured by a "dense row" of trees, and there are trees on both sides of the driveway as well. A person entering from Fir Canyon would necessarily walk past the ramp that leads to the front porch before reaching the back patio or workshop area.

To aid the reader, we provide a picture of the property below.



The driveway leading from Fir Canyon is on the right side and cannot be seen entirely in the photograph. The ramp leading to the front porch is shown to the right of the house. The rear patio and workshop are to the left.

"No trespassing" signs were posted on the front and side of the workshop. According to Bernadette, the workshop and rear patio area is not open to the public. The Boxes considered that space to be "private living and recreation space" and "an extension of [their] interior living space."

With regard to Box's use of his gun, he typically kept it stored in a closet inside the house. Several years before this shooting, Box had accessed the gun for protection when a person trespassed on his property. One month before the shooting, a neighbor, who was under the influence of drugs, attempted to walk into the Boxes' home at around 2:00 a.m. Kelsey testified that she did not think Box would ever point a gun at a police officer. Detective Brown, who investigated the shooting, testified that gun ownership is common in the area where Box lived.

D. *The Troopers' Shooting of Box*

We turn to the facts giving rise to the shooting. The historical facts are largely undisputed, with one exception noted below. The day of the shooting, Bernadette went to Portland for an overnight trip. Box stayed behind to "watch the house." That evening, Box had an argument with Kelsey and Megan. Eventually Box hit Kelsey several times on her face. After Box hit her, Kelsey told Box that she was "going to have someone come and kick his ass." Kelsey called 9-1-1 to report the assault.

West responded to the call first. Dispatch told West that Kelsey was injured and was afraid to leave her bedroom because Box was still present in the home. West tried to call Kelsey, but Box answered instead. The phone call was recorded on West's dash-cam recording system. Box told West that Kelsey and her girlfriend were leaving and described the assault. Box stated that Kelsey "punched [him] in the eye, so [he] punched her back." Box ended the call just as West identified herself as a police officer.

West and Smyth convened near the Box residence. West told Smyth that Box admitted to punching Kelsey. The troopers learned that Kelsey had left the Box residence to go to the hospital. The troopers discussed whether to interview Kelsey at the hospital, which was 10 to 15 minutes away. Smyth and West decided to proceed to the Box residence because they believed they had probable cause to arrest Box for domestic violence assault, and because they "were already there." West was aware that "there are laws that say that a domestic situation is a shall arrest." The troopers

understood that a crime was no longer in progress after Kelsey left the scene. Smyth testified that, at that time, the troopers had no information that anyone at the Box property was in urgent need of medical assistance or that any emergency required immediate entry onto the property.[2]

West testified that she and Smyth did not make a tactical plan for approaching the house. According to the troopers' testimony, the troopers did not discuss any of the following topics before proceeding to the Box property: how they planned to approach the Box residence, whether they would drive up to the house with vehicle lights on or off, or whether they would walk in, who would be the primary and cover officers, the particular circumstances and characteristics of the area or Box's property, what, if any, hazards they might discover, whether Box might be armed, or how they planned to contact Box to initiate a discussion with him. The troopers did not attempt to contact dispatch for more information about Box or to contact Box and instruct him to come outside unarmed.

At approximately 10:55 p.m., the troopers drove to the Box property, parked down the street on Fir Canyon Road, and turned off their vehicle lights. It was dark when the troopers arrived and there were no street lights. Smyth and West walked up the road to Box's driveway. West "followed [Smyth's] lead" during the approach. At the driveway, the troopers stopped and concealed themselves behind trees on either side of the driveway in an attempt to inspect the property without being seen. Smyth was on the right side of the driveway and West was on the left. According to Smyth, the troopers were "on the very edge" of the property "in a place where [they] weren't seen." Smyth and West saw Box walk from his workshop to the rear patio where he was no longer visible. Box was speaking to someone on the phone. Smyth testified that he heard Box say "Oh, they're here already, are they?" From that statement, Smyth concluded that Box knew that the troopers were present. West did not hear anything that Box said.

---

[2] This fact is significant to our later conclusion that the troopers' entry onto the Box property was not justified by a need for emergency aid or exigent circumstances.

While still concealed behind the trees, Box's dogs alerted to the troopers' presence and started barking loudly at the troopers. West arced her taser to scare the dogs away from her. Smyth started moving further up the driveway and into the open clearing, toward the rear patio area. Smyth moved in that direction because he wanted to make contact with Box. Smyth did not know where West was when he was advancing. West started moving toward the house after the dogs moved away from her. There was a light on in Box's workshop and on the front porch, but "the area was not lit up."

A truck and a van were parked between the rear patio area and the clearing, as shown in the picture provided above. Smyth moved to a position near the driver's side of the van, with the van between Smyth and the house. From his position near the van, Smyth called out to Box to come outside. Smyth did not identify himself as an OSP trooper before calling Box outside. Box stepped out of the rear patio door. Box was still on the phone, which he was holding with his left hand. Box walked from the rear patio to the area between the front of the van and the side of the truck bed, which was six to 10 feet from Smyth. West was somewhere behind Smyth in the clearing.

Both troopers saw that Box had a gun in the front pocket of his pants on the right side. Both troopers saw Box reach for his gun. Smyth saw Box pull the gun from his pocket with his right hand. Box brought the gun with one hand "up over the [truck] bed," which was three to four feet high. Smyth thought Box pointed the gun at West, because he thought West was somewhere to his left where Box was pointing the gun. Smyth did not know where Box was looking at the time or what Box was doing with his left hand, because he was focused on the gun. Smyth acknowledged that he experienced tunnel vision when he saw Box holding the gun: "I've got both hands on my gun, and I see my gun crystal clear. And I don't see his head and I don't see his legs. I have nothing, I've got tunnel vision, I don't see anything." Smyth also experienced "auditory exclusion." West did not see Box point the gun at her.

On West's dash-cam recording, Box can be heard saying something that sounds like "hang on" before Smyth identifies himself as law enforcement. Smyth says "Trooper Smyth and Trooper West, state police, you are being recorded." While Smyth is speaking, Box says "Oh" in a surprised manner. Almost immediately after Smyth finishes identifying himself and West, Smyth says "don't go for that gun." Box says something in response that is difficult to discern. Plaintiff contends that Box states, "Let me show you I'm getting this outta here." Defendant argues that the statement is unintelligible. West begins to yell "get your hands—" before she is cut off by the sound of gunfire.

Smyth fired his gun first, and West fired second. Box dropped the gun in the back of the truck bed and fell to the ground. Box never fired the gun. It was recovered in the rear of the truck bed, behind the wheel well on the passenger's side, the side nearest the rear patio. Smyth fired seven rounds, five of which struck Box. West fired four, and struck Box twice. Smyth's shell casings were found near the rear of the van on the driver's side. West's were found farther behind Smyth on the side of the clearing opposite the house.

Dr. Olson performed the autopsy. Box had three bullet wounds in his upper abdomen that "go at a steep downward angle from left to right" to the pelvic area. Based on Box's height, which was over six feet, Olson determined that Box was bent over when he was struck by those bullets. According to Olson, those bullet wounds were also likely the fatal wounds.

Bernadette Box was on the phone with her husband that night and at the time of the shooting. Box told Bernadette that he was listening to the police scanner but had not heard anything about the police coming to arrest him. Bernadette could "hear the dogs going off" through the phone. Box told her that he could hear the dogs and that he thought "[there was] someone in the bushes."

As a result of the troopers' shooting and killing of Box, plaintiff brought this wrongful death action alleging both a negligence claim and a trespass claim. We address the details of each claim separately below in the respective analyses of the issues on appeal that apply to each claim.

## II.   PLAINTIFF'S NEGLIGENCE CLAIM

### A.   *Procedural Background*

As briefly noted above, plaintiff alleged two specifications of negligence against the state. The first alleged that the troopers' preshooting conduct was negligent and the second alleged that OSP negligently supervised and trained Smyth. As to the first specification, plaintiff alleged that the troopers negligently approached the Box home, and, in doing so, created conditions where the use of lethal force became probable. The crux of plaintiff's theory is that Box was disarming when the troopers shot him, and that the troopers would either have seen that Box was disarming or Box would have disarmed before exiting his house if not for the troopers' negligence or OSP's negligent supervision and training. Specifically, plaintiff alleges that the state, acting through West and Smyth, "unreasonably created a foreseeable risk of a need to use deadly force and, therefore, was negligent in one or more of the following particulars, each of which was a substantial factor in causing the death" of Box:

"a.   In failing to provide Mr. Box with reasonable advance notice of the presence of law enforcement by approaching the driveway entrance to the Box Property in their patrol vehicles with lights on and overhead lights activated;

"b.   In failing to use a cell phone or the dispatch operator to communicate with Mr. Box that they were present and that he should present himself for questioning, unarmed;

"c.   In not using a microphone and loudspeaker to announce their presence from one of their two patrol vehicles;

"d.   In failing to inquire of Mr. Box whether he was armed before asking him to come out and talk with them;

"e.   In failing to initiate communication with Mr. Box from a position of hard cover and distance;

"f.   In failing to tactically retreat or reposition after the dogs alerted to their presence.

"g.   In conducting an unlawful and secret entry and search of the Box property."

With respect to the second specification, plaintiff alleged that Smyth's supervising officers "were negligent in one or more of the following particulars, each of which was a substantial factor in causing the death" of Box:

"a.    Failure of Smyth's SWAT supervisors to inform and provide complete information to Smyth's patrol supervisors about Smyth's tunnel vision deficiency;

"b.    Failure of Trooper Smyth's patrol supervisors to critically evaluate Smyth's tunnel vision deficiency and assess whether it rendered Smyth unfit to safely perform the duties of his position;

"c.    Failure to re-assign Trooper Smyth to a position in which his tunnel vision deficiency would not pose a danger to the public;

"d.    Retaining Trooper Smyth in light of the danger to the public posed by his tunnel vision deficiency.

"e.    Failure to adopt standards and procedures that require a fitness for duty evaluation of a trooper who has demonstrated the deficiencies of Trooper Smyth.

"f.    Failure to properly train its troopers how to safely approach persons' homes and property in rural Josephine County under the above described circumstances."

As noted, defendant moved for summary judgment on all of plaintiff's claims. With respect to the negligence claim, defendant argued that the troopers acted reasonably in their approach to Box's home and in their use of lethal force against Box and that there was no causal connection between the alleged negligent conduct of the troopers and Box's death. As to the negligent retention and supervision theory, defendant asserted that, because the troopers had acted reasonably the night of the shooting, there was no causal connection between any claimed negligence by OSP and Box's death. Defendant also argued that apparent authority immunity applied to the actions of the troopers and OSP's supervision of them, entitling it to summary judgment.

Plaintiff opposed, pointing to evidence in the record from which a reasonable juror could find for plaintiff based on her theory that OSP's negligent training and supervision

and the troopers' negligent preshooting conduct created the circumstance that caused the troopers to make the split-second decision to shoot and kill Box. Plaintiff's counsel also filed an ORCP 47 E declaration, which stated that a qualified expert had been retained whose testimony would create questions of fact sufficient to defeat summary judgment with regard to negligence and causation. Lastly, plaintiff argued that apparent authority immunity did not bar plaintiff's claims because there was no evidence that the troopers relied on any law when they engaged in the allegedly negligent conduct.

The trial court granted summary judgment to defendant on all of plaintiff's claims. Although the court expressed skepticism with respect to the merit of plaintiff's theories of negligence, it ruled that plaintiff's ORCP 47 E declaration was sufficient to create an issue of material fact on negligence and causation. Ultimately, however, the court concluded that plaintiff's claims were barred under ORS 30.265(6)(f), the apparent authority immunity provision of the Oregon Tort Claims Act. The court identified two statutes as forming the basis of apparent authority immunity in this case, ORS 133.055(2)(a), which directs police officers to arrest suspected perpetrators of domestic violence, and ORS 161.239, which authorizes police officers to use deadly force in certain circumstances, including in self-defense and defense of others.

In her first assignment of error on appeal, plaintiff argues that the trial court erred in concluding that apparent authority immunity applied to plaintiff's negligence claim. Defendant, in turn, cross-assigns error to the court's conclusion that the ORCP 47 E declaration was sufficient to create an issue of fact on the element of causation. We first address apparent authority immunity.

B. *Apparent Authority Immunity*

Apparent authority immunity "applies to public actors who, acting without bad faith or malice, rely on their plausible interpretation of laws that turn out to be unconstitutional, invalid, or inapplicable." *Cruz v. Multnomah County*, 279 Or App 1, 13, 381 P3d 856 (2016);

ORS 30.265(6)(f).[3] For the purposes of apparent authority immunity, an "inapplicable" law includes a law that is otherwise valid but is misinterpreted by a public actor. *Cruz*, 279 Or App at 18 ("A valid law that is misconstrued by a public actor to authorize or require the public actor to take a particular action is an inapplicable law" if "the law, properly construed, would not authorize or require the action.").

A public actor invoking apparent authority immunity is not required to analyze the validity of a statute before relying on it, but the actor must rely on a plausible interpretation of the statute at the time the actor commits the act or omission for which the actor seeks immunity. *See id.* at 16 (in determining whether the defendants were immune for the unlawful detention of the plaintiff, "the relevant temporal context [was] whether defendants' construction was plausible at the time that they detained plaintiff"); *Walker v. Mitchell*, 133 Or App 565, 576, 891 P2d 1359 (1995) (apparent authority immunity did not apply to state aeronautics division's allegedly improper classification of an airport, despite argument that it relied on the application of an administrative rule, because there was no evidence in the record that the division in fact relied on that rule in classifying the airport).

On appeal, plaintiff contends that the trial court erred in applying apparent authority immunity on this record, because there is no "nexus" between the negligent conduct plaintiff alleged against the troopers and OSP and the statutes that the troopers and OSP supervisors purportedly relied on for immunity.

In response, defendant contends that apparent authority immunity defeats plaintiff's negligence claim because the troopers were acting under a plausible interpretation of ORS 161.239(1)(c) and (e), which authorize a police officer's use of

---

[3] ORS 30.265(6)(f) provides that public bodies and their officers, employees, and agents acting within the scope of their employment are immune from liability for

"[a]ny claim arising out of an act done or omitted under apparent authority of a law, resolution, rule or regulation that is unconstitutional, invalid or inapplicable except to the extent that they would have been liable had the law, resolution, rule or regulation been constitutional, valid and applicable, unless such act was done or omitted in bad faith or with malice."

deadly force while making an arrest. As we understand it, defendant's argument does not address a connection between the allegedly negligent conduct—the troopers' and OSP's pre-shooting negligence—and ORS 161.239. Instead, defendant contends that it cannot be liable for preshooting negligence if it is immune for the shooting itself. Essentially, defendant argues that summary judgment was appropriate because the shooting was the actual cause of Box's death, and that, therefore, plaintiff cannot prove that the preshooting negligence caused Box's death as a matter of law.

As we explain, we reject defendant's causation argument and conclude that plaintiff is not precluded from proving, as a matter of law, that the preshooting negligence was a cause of Box's death. Although we reach that argument later in this opinion, for the purpose of our apparent authority immunity analysis, we note that, in rejecting defendant's causation argument, we consequently reject defendant's argument that it cannot be liable for preshooting negligence if it is immune for the shooting itself. Thus, the issue before us is not, as defendant implies, whether apparent authority immunity applies to the troopers' decision to shoot Box, but whether apparent authority immunity applies to the conduct at issue in plaintiff's complaint: the troopers' preshooting tactical decisions and OSP's preshooting supervisory decisions.

With that background in mind, we turn to the legal question raised by plaintiff in her first assignment of error, whether apparent authority immunity applies to her negligence claim. As explained below, we conclude that apparent authority immunity does not immunize defendant for the preshooting negligent conduct of the troopers or Smyth's OSP supervisors, and, therefore, the trial court erred in granting summary judgment to defendant on the ground of apparent authority immunity.

The trial court concluded that the troopers had relied on both ORS 133.055(2)(a) and ORS 161.239 in taking the actions that they did.[4] ORS 133.055(2)(a) provides, in

---

[4] Defendant makes no argument on appeal with respect to ORS 133.055(2)(a) and only argues that the troopers were acting under a plausible interpretation of ORS 161.239(1)(c) and (e) when they shot and killed Box. Because the trial court identified both statutes in its ruling, we address each of them in our analysis.

part, that, "when a peace officer responds to an incident of domestic disturbance and has probable cause to believe that an assault has occurred between family or household members, *** the officer shall arrest and take into custody the alleged assailant." ORS 161.239(1)(c) and (e) provide, in part, that "a peace officer may use deadly physical force" when the officer "reasonably believes" that "the use of deadly physical force is necessary to defend the peace officer or another person from the use or threatened imminent use of deadly physical force," or that the officer's "life or personal safety is endangered." Given the particular theories of negligence in this case, neither statute provides apparent authority immunity to the state.

With respect to the troopers' preshooting tactical negligence, nothing in the record suggests that the troopers relied on either statute in determining their tactical manner of approach. The troopers identified the "shall arrest" statute, ORS 133.055(2)(a), as contributing to their decision to proceed to the Box residence instead of meeting Kelsey at the hospital, and the troopers' statements support an inference that the troopers understood that statute to require them to go to Box's home to arrest him. But, even if that were a plausible interpretation of the statute, that would merely immunize the troopers for an arrest of Box.[5] There is no evidence that suggests that the troopers relied on the "shall arrest" statute in either their failure to develop a tactical plan of approach or in their tactical decisions at the scene. Additionally, an interpretation of the statute that authorized those alleged tactical errors would not be a plausible interpretation.

Similar reasoning applies to the deadly force statute, ORS 161.239. The troopers may have been aware of their legal right to use self-defense when threatened with force, and the troopers both testified that they believed Box was a threat to their safety. However, a finding that the officers relied on the deadly force statute in their decisions to shoot

---

[5] As we explain in our discussion of plaintiff's trespass claim, due to well-established constitutional protections of the home and curtilage, that statute would not plausibly permit the troopers to enter those areas absent certain exceptions that do not apply in this case.

Box would not provide immunity for any of the preshooting tactical choices that plaintiff alleges were negligent in this case. There is no evidence that the troopers relied on the deadly force statute in making those tactical decisions, nor could any plausible interpretation of the deadly force statute justify making them.

As for OSP's alleged negligent supervision and retention of Smyth, we reach the same conclusion. There is no evidence in the record that any of Smyth's OSP supervisors relied on either statute in making decisions about Smyth's training, performance reviews, or retention. Both statutes are entirely unrelated to those supervisory decisions. Therefore, no interpretation of either statute could justify the negligent conduct that plaintiff alleges, and the trial court erred in granting summary judgment to defendant on that basis.

C.  *Causation*

Defendant asserts that the trial court's grant of summary judgment to defendant on plaintiff's negligence claim was nonetheless appropriate, because plaintiff's causation argument fails as a matter of law. As noted above, defendant argues that plaintiff is precluded from proving that the alleged preshooting negligence caused the death of Box. As we understand that argument, defendant asserts that the troopers' shooting of Box was reasonable—or as previously noted, immune from suit under apparent authority immunity—and the actual cause of Box's death. Therefore, in defendant's view, under *Joshi v. Providence Health System*, 342 Or 152, 149 P3d 1164 (2006), the alleged preshooting negligence could only have increased the risk of Box's death, and could not, as a matter of law, "constitute the requisite cause" of his death as required by ORS 30.020, the wrongful death statute. Defendant's causation rationale is the logical basis for several of defendant's arguments in this case, including its challenge to the trial court's decision to give effect to plaintiff's ORCP 47 E declaration, and, therefore, we address it in detail below.

We first briefly address defendant's contention that the shooting was reasonable, which defendant asserts plaintiff

admitted below. In an opposition memorandum filed with the trial court, plaintiff stated that

> "plaintiff does not dispute that when Troopers Smyth and West fired their weapons, they did so having the belief that it was necessary for their own protection. Those acts are not alleged to be negligent, nor is their belief it was necessary to shoot germane to the reasonableness of the conduct that is at issue."

Plaintiff went on to explain that "[t]he actions at issue are those which created the circumstances that forced Smyth and West to make that split second decision to defend themselves—the supervision and training they received and their tactical decisions and actions." Defendant insists that the statement was an admission by plaintiff that the shooting was, itself, reasonable. We disagree. Plaintiff was simply distinguishing the allegedly negligent acts that form the factual basis of her claim from other acts of the troopers, for the purpose of ensuring that any assessment of reasonableness properly focused on the acts that plaintiff alleged were negligent. In doing so, plaintiff did nothing more than describe the crux of her claim, that the troopers' preshooting tactical approach was negligent, and that Box was shot as a result of that negligence.

In any case, we need not, and do not, decide whether the shooting itself was reasonable because we reject defendant's argument that any preshooting negligence cannot be a cause of Box's death. As we explain below, defendant's assertion to the contrary is based in a misunderstanding of causation and plaintiff's theories of negligence.

The plaintiff in a wrongful death action must prove that a defendant's tortious act or omission was the cause-in-fact of the decedent's death. Cause-in-fact "has a well-defined legal meaning: it generally requires evidence of a reasonable probability that, but for the defendant's negligence, the plaintiff would not have been harmed." *Joshi v. Providence Health System*, 198 Or App 535, 538-39, 108 P3d 1195 (2005), *aff'd*, 342 Or 152, 149 P3d 1164 (2006). There may be multiple causes-in-fact of a single injury. *Wright v. Turner*, 354 Or 815, 831, 322 P3d 476 (2014) ("[A] person's injuries may have multiple causes without necessarily being

incurred in multiple accidents."); *Joshi*, 198 Or App at 542 ("[I]f it was a cumulative cause of a harm, negligent conduct may be a 'but-for' cause of the harm even if the conduct was not, by itself, sufficient to cause the harm." That is so because "causation-in-fact includes every one of the great number of events without which any happening would not have occurred. *** Each of those events is considered to be a cause-in-fact of a harm, even though other events were also necessary antecedents of the harm." (Internal quotation marks omitted.)). It follows that, where there are multiple causes-in-fact of a plaintiff's injury, some of those causes may be non-negligent acts. A defendant whose negligent act is a cause of the plaintiff's injury is not necessarily absolved of legal liability for that negligent act, merely because other, non-negligent conduct was also a cause of the plaintiff's injury. *Cf. Horton v. OHSU*, 277 Or App 821, 830-31, 373 P3d 1158 (2016) (where the plaintiff underwent liver transplant surgery to save her child after the defendants negligently performed surgery on the child, reasonable factfinder could determine that negligent surgery was a cause-in-fact of the plaintiff's harm, despite the plaintiff's intervening choice to have the transplant surgery).

Here, plaintiff's theory of causation is that, absent OSP's negligent supervision and retention of Smyth or the troopers' negligent tactical approach to the Box residence, the troopers would not have been in the circumstances that required them to make the decision whether or not to use lethal force. Therefore, to defeat summary judgment on the issue of causation, plaintiff was required to identify evidence from which a reasonable juror could infer that, absent OSP's or the troopers' preshooting negligence, there was a reasonable probability that the shooting would not have occurred. Under plaintiff's theory, whether the ultimate decision to shoot Box was reasonable is immaterial.

Although *Joshi* informs the causation analysis in every wrongful death case, defendant's reliance on *Joshi* is misplaced here. In that case, the plaintiff brought a wrongful death action against a hospital, alleging that the medical staff had contributed to her husband's death by negligently failing to diagnose and treat his stroke. *Joshi*, 342 Or at

155. At trial, the plaintiff offered expert testimony that, had the defendants diagnosed the stroke earlier, her husband would have benefited from treatment. However, the expert opined that the administration of any treatments would have given the plaintiff's husband, "at most, a 30 percent chance of improvement in outcome." *Id.* at 156.

The Supreme Court first held that a plaintiff in a wrongful death action brought under ORS 30.020 "must demonstrate that the defendant's negligent act or omission more likely than not brought about the death of the decedent." *Id.* at 159. The plaintiff may do so "by showing a reasonable probability that a defendant's act led to decedent's death or by showing that defendant's act was a substantial factor in decedent's death." But the plaintiff "cannot avoid [that] requirement by showing that defendants' negligent act or omission merely increased the risk of death." *Id.* at 164. Accordingly, the *Joshi* court held that the plaintiff could not demonstrate a reasonable probability that the defendants' negligence led to the decedent's death, where the plaintiff's evidence only established, at most, that even if the treatment had not been negligent, the decedent's chance of survival was only 30 percent greater. *Id.*

Defendant contends here that, as in *Joshi*, plaintiff can only show that the alleged negligent conduct increased the risk of death, which is insufficient as a matter of law. Defendant argues that that is so because the shooting itself was reasonable under the circumstances and the actual cause of Box's death; any preshooting conduct can only have increased the risk of Box's death. We conclude that the reasoning in *Joshi* does not control the outcome here, because *Joshi* is factually distinct from this case.

In *Joshi*, the expert opined that the decedent had only a 30 percent chance of survival—or, stated another way, a 70 percent chance of death—even with competent treatment. That is, the expert employed mathematical percentages to opine that it was more likely than not that the decedent would have died regardless of the defendants' negligence. In this case, the record lacks the kind of evidence that could provide the clarity and certainty inherent in the percentages to which the *Joshi* expert opined. Instead, the

evidence in the record on which a reasonable juror could rely is subject to more than one reasonable inference, including ones that could support a finding that OSP's or the trooper's preshooting negligence was a cause of Box's death and not merely circumstances that increased the risk of death. Further, in *Joshi*, the substantial probability that the decedent would die preexisted the defendants' negligence. Here, plaintiff alleges the opposite—that defendant's negligence *created* the risk that the use of lethal force would be necessary. In other words, plaintiff asserts that OSP's and the troopers' actions started the causal sequence that led to Box's death.

Defendant also argues that plaintiff's negligent supervision and retention claim fails as a matter of law, because the actual shooting was not tortious and was "the only act that Smyth's alleged 'tunnel vision' is relevant to." Again, defendant's argument fails to account for the actions at issue in plaintiff's negligence claim, the preshooting conduct. Plaintiff has alleged that defendant's employee, Smyth, committed a tort when he acted negligently prior to the shooting, and that that negligent conduct caused Box's death. Additionally, Smyth's tunnel vision and other performance issues that OSP was allegedly aware of are relevant to Smyth's preshooting conduct and decision making—not only to the shooting itself. To recap this section, we reject defendant's argument that the alleged preshooting negligence by the state troopers could not have caused Box's death as a matter of law.

### D.  *Plaintiff's ORCP 47 E Declaration*

Having determined that plaintiff is not precluded from proving causation in the manner alleged, we turn to defendant's cross-assignment of error. Defendant argues that the trial court erred in ruling that plaintiff's ORCP 47 E declaration was sufficient to create an issue of fact as to causation. The declaration stated:

> "An unnamed, qualified expert has been retained who is available and willing to testify to admissible facts or opinions creating a question of fact sufficient to controvert the allegations of the defendant with regard to negligence and causation, and whose facts and opinions if revealed by

affidavit or declaration would be a sufficient basis for denying the motion for summary judgment."

On appeal, defendant argues, as it did to the trial court, that the ORCP 47 E declaration was not sufficient to defeat summary judgment because expert testimony could not create a fact issue on causation as a matter of law. *See VFS Financing, Inc. v. Shilo Management Corp.*, 277 Or App 698, 706, 372 P3d 582, *rev den*, 360 Or 401 (2016) (ORCP 47 E affidavit did not preclude summary judgment because expert could not testify to create a fact issue regarding the plaintiff's failure to meet a standard of commercial unreasonableness when the courts had already determined that the plaintiff's conduct was commercially reasonable as a matter of law). We conclude that the trial court did not err in concluding that the ORCP 47 E declaration created an issue of fact on the element of causation.

The Oregon Rules of Civil Procedure "protect from pretrial disclosure the identities of experts and the substance of their testimony." *Hinchman v. UC Market, LLC*, 270 Or App 561, 569, 348 P3d 328 (2015). As such, ORCP 47 E

> "authorizes attorneys to submit, in good faith, an affidavit that states that an unnamed qualified expert has been retained and will testify to admissible facts or opinions creating a question of fact and provides that such an affidavit 'will be deemed sufficient to controvert the allegations of the moving party' and will be an 'adequate basis for the court to deny the motion.'"

*Two Two v. Fujitec America, Inc.*, 355 Or 319, 328, 325 P3d 707 (2014) (quoting ORCP 47 E). In other words, an ORCP 47 E affidavit or declaration is generally sufficient to create issues of fact and defeat summary judgment as to the issues raised in the summary judgment motion, or to the issues identified in the affidavit, if the affidavit so specifies. *Id.* at 329-30.

However, "[t]he submission of an ORCP 47 E affidavit or declaration does not automatically create an issue of fact, but will preclude summary judgment when the expert testimony is 'required' to establish a genuine issue of material fact." *VFS Financing, Inc.*, 277 Or App at 706 (citing

*Hinchman*, 270 Or App at 569). One instance when "expert testimony is 'required' to create a genuine issue of material fact" is "when 'the point or points put at issue by the \*\*\* summary judgment motion are ones that are susceptible to proof through expert testimony, given the plaintiff's particular theory of her claim.'" *Id.* (quoting *Hinchman*, 270 Or App at 570 (ellipsis in *VFS Financing, Inc.*)).

Defendant makes two arguments as to the sufficiency of the ORCP 47 E declaration in this case. First, as noted, defendant argues that the ORCP 47 E declaration was not sufficient to defeat the motion for summary judgment on the issue of causation because plaintiff cannot prove, as a matter of law, that the alleged negligence was the cause-in-fact of Box's death. We reject that argument for the reasons stated above. Second, defendant argues that the ORCP 47 E declaration is not sufficient in this case because the issue of causation is not "susceptible" to proof by expert testimony. We also reject that argument. As we explained in *Hinchman*, the points or point at issue in a motion for summary judgment are susceptible to proof by expert testimony if they could "conceivably be proven through expert testimony," and do not "necessarily \*\*\* require proof by testimony from witnesses with personal knowledge." 270 Or App at 572. Further, "[a]s a consequence of Oregon's policy choice to broadly shield the content of expert testimony from discovery and disclosure pretrial \*\*\* the assessment of whether an ORCP 47 E affidavit creates an issue of fact precluding summary judgment will sometimes require an act of imagination by the summary judgment court." *Id.* at 570. Here, expert testimony could be helpful to the jury in its determination of causation. That is, it is at least conceivable that an expert witness could explain why OSP's training and standards, or the troopers' tactical errors, caused Box's death based on the witness's expertise in the area.

Further, even if plaintiff's theory of causation was not susceptible to proof by expert testimony, there is enough evidence in the summary judgment record from which a jury could infer that defendant's preshooting negligence caused Box's death. *See Two Two*, 355 Or at 331-32 (reasoning that, even if an ORCP 47 E affidavit was given the limited interpretation that the plaintiffs had retained an

expert to testify only to the defendant's failure to meet the standard of care, "a jury could nonetheless infer from that evidence of negligence and other facts in the summary judgment record that defendant's negligence caused plaintiffs' injuries").

A plaintiff need not present direct evidence that the defendant's negligent conduct caused the injury, or that the injury would not have otherwise occurred. *Magnuson v. Toth Corp.*, 221 Or App 262, 268, 190 P3d 423, *rev den*, 345 Or 415 (2008). Rather, "[c]ausation may be proved by circumstantial evidence, expert testimony, or common knowledge." *Two Two*, 355 Or at 332 (citing *Trees v. Ordonez*, 354 Or 197, 220, 311 P3d 848 (2013)). And, in assessing the sufficiency of the evidence "on summary judgment, the question is not which conclusion is most likely but whether an issue of fact exists that permits jury resolution." *Id*. Here, the summary judgment record supports reasonable inferences from which a reasonable jury could conclude that there is a reasonable probability that the shooting would not have occurred absent the troopers' and OSP's negligent conduct, because it is the troopers' preshooting negligent conduct that put the troopers in a position to have to make a split-second decision whether or not to shoot and kill Box, and, with respect to Smyth, put Smyth in that position when it was known to OSP that his stress-induced deficiencies compromised his ability to follow protocol and properly make those kinds of tactical and split-second decisions.

A jury would not be required to make inferences from the evidence that support plaintiff's theory of causation, and a jury might reasonably reject plaintiff's theory. However, it is for the jury to determine what reasonable inferences it will draw from the evidence. *State v. Miller*, 196 Or App 354, 358, 103 P3d 112 (2004), *rev den*, 338 Or 488 (2005).

In sum, the trial court erred in granting summary judgment to defendant on plaintiff's negligence claim.

### III.   PLAINTIFF'S TRESPASS CLAIM

We turn to plaintiff's second assignment of error, which asserts that the trial court erred when it denied plaintiff's motion for partial summary judgment on plaintiff's

trespass claim[6] and when it granted defendant's summary judgment motion on the trespass claim. We first summarize the relevant procedural history and the parties' arguments before the trial court, before turning to plaintiff's appeal.[7]

Plaintiff's claim for trespass alleged that defendant, "acting through its troopers, intentionally or recklessly entered the Box Property" and that defendant "lacked lawful authority, privilege or consent" to do so. Plaintiff further alleged that, "[a]s a direct result of the defendant's trespass, [Box] was shot dead" and that plaintiff was entitled to recover damages for "the physical and mental pain, suffering and distress sustained by Mr. Box between the time of the shooting and his death," "the pecuniary loss to the Estate," and "pecuniary loss and the loss of the society, companionship and services" to Box's family.

Plaintiff moved for *partial* summary judgment on the trespass claim, contending that the troopers were trespassers as a matter of law. Plaintiff argued that, absent a warrant or an exception to the warrant requirement, a law enforcement officer has no greater authority to enter the land of another. Plaintiff contended that, although consent is generally implied for strangers to approach the front door to a residence, the reverse is presumed for other areas in

---

[6] As a point of clarification, we note that, to prevail on her partial motion for summary judgment, plaintiff was not required to present evidence concerning her alleged damages or that the trespass caused Box's death. Although a plaintiff in an action for trespass who wishes to recover actual damages must prove that the trespass caused those damages, nominal damages are presumed. *Rhodes v. Harwood*, 273 Or 903, 926, 544 P2d 147 (1975) (in an action for trespass to land, "the law presumes that a plaintiff has been damaged without the necessity of proof of actual damage"). Therefore, the only issue with respect to plaintiff's motion is whether the troopers lacked authority to enter particular areas of Box's property.

[7] Generally, an order denying a motion for summary judgment is not appealable. *Cessna v. Chu-R & T, Inc.*, 185 Or App 39, 50, 57 P3d 936 (2002), *rev den*, 335 Or 266 (2003). However, "[i]n an appeal arising from cross-motions for summary judgment, the granting of one motion and the denial of the other are both reviewable." *Arrowood Indemnity Co. v. Fasching*, 304 Or App 749, 751, 469 P3d 271, *rev allowed*, 367 Or 290 (2020). Because both parties moved for summary judgment on the trespass claim in their respective motions, we treat plaintiff's assignment of error as an appeal arising from cross-motions for summary judgment and, thus, the trial court's order denying plaintiff's partial motion for summary judgment and granting summary judgment to defendant on the trespass claim is reviewable.

the curtilage of a home. Therefore, according to plaintiff, the troopers exceeded the scope of implied consent when they hid behind the trees to surveil the Box property, and when they bypassed the front door to approach the rear patio entrance. Plaintiff also argued that no exigent circumstances existed that would justify the troopers' entry into the curtilage of Box's home under that exception to the warrant requirement.

Defendant responded, in relevant part, that the troopers' presence was justified by exigent circumstances to investigate and preserve evidence. Defendant also argued that the troopers were on "permissible areas" of the Box property because visitors could reasonably assume that the rear patio door was the main entrance. Defendant argued that, in any case, the distinction between the back and front yard was immaterial, because, when the troopers saw Box from behind the trees, they were entitled to approach him under *State v. Gabbard*, 129 Or App 122, 877 P2d 1217, *rev den*, 320 Or 131 (1994).

Defendant also moved for summary judgment on the entire trespass claim. In addition to the same arguments that defendant raised in response to plaintiff's motion, defendant argued that there was no causal connection between the troopers' presence on the property and Box's death. Defendant also argued that apparent authority immunity applied to the trespass claim.

The trial court denied plaintiff's motion for partial summary judgment and granted defendant's motion for summary judgment on the trespass claim. The court first concluded that the troopers did not trespass as a matter of law. The court stated that Box knew the troopers were present on the property when they arrived and "armed himself to encounter the police." The court explained that the troopers "had enough information to believe that Mr. Box was expecting them" and, therefore, "had a valid concern about contacting him within his house." The court concluded that the troopers had a legal right to walk up Box's driveway to his front door, and further agreed with defendant that "[t]here is no significant difference between the facts in this case" and "the facts in *Gabbard*," a case in which

the police officers were entitled to approach the defendant when he emerged from a shed on his property. Therefore, the court concluded, the troopers were entitled to bypass the front door and approach the rear patio area when they saw Box walking there "whether or not they approached him within in his curtilage." Although the court was not entirely clear, in responding to plaintiff's argument that the troopers exceeded the scope of implied consent by hiding behind the trees lining the driveway, the court further determined that the troopers' act of hiding behind the trees was "not the basis for damages in this case." Therefore, the court granted summary judgment to defendant and denied plaintiff's motion for summary judgment on the grounds that the troopers did not trespass as a matter of law. Ultimately, the court also granted summary judgment to defendant on the trespass claim on the ground that apparent authority immunity applied based on the troopers' reliance on ORS 133.055(2)(a), which required them to arrest the suspect in cases of domestic violence.

On appeal plaintiff argues that the troopers were trespassers as a matter of law, raising substantially the same arguments that she did before the trial court. Plaintiff also challenges the court's conclusion that apparent authority immunity applied to the trespass claim.

Defendant makes no arguments with respect to the troopers' status as trespassers. Instead, it contends that the trespass did not cause Box's death and the resulting damages as a matter of law. As with the negligence claim, defendant argues that "the only possible theory" of causation for the trespass claim is that the trespass increased the risk that the troopers would use lethal force. Defendant also argues that the trial court correctly concluded that apparent authority immunity applied to the trespass claim because the troopers interpreted ORS 161.239(1)(c) and (e) to authorize their use of deadly force.

From the trial court rulings and the parties' arguments on appeal, we understand the issues relevant to plaintiff's second assignment of error to be whether (1) either party is entitled to summary judgment on the basis that the troopers were or were not trespassers as a matter of law,

(2) apparent authority immunity applied to the trespass claim, and (3) a dispute of fact exists as to whether the alleged trespass caused Box's death, which is the basis of plaintiff's damages.

We begin with the troopers' status as trespassers. "On review of cross-motions for summary judgment, we view the record for each motion in the light most favorable to the party opposing it to determine whether there is a genuine issue of material fact and, if not, whether either party is entitled to judgment as a matter of law." *O'Kain v. Landress*, 299 Or App 417, 419, 450 P3d 508 (2019). A material fact is "one that, under applicable law, might affect the outcome of a case." *Zygar v. Johnson*, 169 Or App 638, 646, 10 P3d 326 (2000), *rev den*, 331 Or 584 (2001). We have reviewed the summary judgment record and conclude that it does not present a genuine dispute of material fact. We further conclude, for the reasons below, that the troopers were trespassers as a matter of law. Therefore, the trial court erred in denying plaintiff's motion for partial summary judgment and granting summary judgment to defendant on the basis that the troopers were not trespassers as a matter of law.

"Trespass to real property is an intentional entry upon the land of another by one not privileged to enter." *Collier v. City of Portland*, 57 Or App 341, 344, 644 P2d 1139 (1982). In general, that rule also applies to the intentional intrusion onto land by law enforcement officers; absent some privilege or authority to enter the property of another, a police officer who does so is liable for trespass. *State v. Ohling*, 70 Or App 249, 253, 688 P2d 1384, *rev den*, 298 Or 334 (1984) (explaining that officers trespassed when, after knocking on the front door and receiving no response, they entered the defendant's backyard, because officers lacked consent and "[n]either the warrant nor their status as peace officers gave them any greater right to intrude onto defendant's property than any other stranger would have"); *Collier*, 57 Or App at 344 ("Merely entering a building constitutes a trespass, and, unless the law provides an exception applicable to the facts of this case, there was a trespass when the police entered plaintiff's residence.").

An officer may acquire the authority or privilege to enter another's property from a warrant or if an exception to the warrant requirement applies, such as the exception for exigent circumstances. *Id*. at 345. An officer's entry may also be justified by implied or express consent of the homeowner. *State v. Somfleth*, 168 Or App 414, 424, 8 P3d 221 (2000). Strangers, including police officers, have implied consent to enter the curtilage of a home to approach the front door. *Id*. ("[G]iven prevailing social norms, the homeowner is presumed to have implicitly consented to entry into the front yard to approach the front door."). Conversely, "such a presumption of implied consent to enter is not ascribed to other areas of the curtilage." *Id*. at 425. Rather, "entry onto those areas is presumptively a trespass." *Id*.

The facts relevant to the troopers' status as trespassers are few, and largely undisputed. To the extent there are disputed issues of fact relevant to the trespass claim, we address them later in our analysis. Prior to entering Box's property, the troopers were aware that Kelsey and her girl-friend had left. The troopers entered the Box property and hid behind the trees. From there, Smyth moved to a position next to the van in the rear patio area and West moved into the clearing behind Smyth. The front porch light was on, but both troopers bypassed the ramp leading to the front porch and door. A person entering from Fir Canyon would necessarily walk past that ramp. The only other light came from the workshop. A "No Trespassing" sign was posted on the front of the workshop.

Given the undisputed fact of the troopers' warrant-less entry, the troopers trespassed unless that entry was authorized by exigent circumstances, the need for emergency aid, or express or implied consent.[8] Thus, the question

---

[8] As noted, ORS 133.055(2)(a) directs officers to investigate and arrest suspects in cases of domestic violence, and ORS 133.235(5) provides that, "[i]n order to make an arrest, a peace officer may enter premises in which the officer has probable cause to believe the person to be arrested to be present." Given established constitutional principles requiring a warrant or an exception to that requirement before police may enter a person's home, those statutes do not give law enforcement officers authority to enter a home or the protected areas surrounding it. *State v. Olson*, 287 Or 157, 164-65, 598 P2d 670 (1979) ("[B]oth the Oregon and the United States Constitutions dictate that where exigent circumstances which militate against securing [a] warrant do not exist, probable cause

before us is whether there was a genuine dispute of material fact as to whether any of the above conditions existed, and, if not, whether either party is entitled to summary judgment as a matter of law. We consider each condition in turn.

On this record, there is no genuine dispute regarding the existence of exigent circumstances or an emergency requiring the troopers' aid that would justify the troopers' locations on the property. The troopers testified that they were aware that Kelsey had left for the hospital, and the record lacks any evidence that the troopers were required "to act swiftly to prevent danger to life or serious damage to property, or to forestall a suspect's escape or the destruction of evidence." *State v. Pierce*, 226 Or App 336, 341, 203 P3d 343 (2009).

Nor is there evidence that Box gave his express consent for either trooper to enter, and we conclude that there is no dispute of material fact as to whether the troopers had implied consent. As noted, a homeowner is presumed to impliedly consent to entry into the curtilage to approach the front door. That implied consent is limited and "does not extend to conduct beyond that which would reasonably be expected of someone approaching the door." *State v. Goldberg*, 309 Or App 660, 667, 483 P3d 671 (2021). Further, the presumption that a person impliedly consents to visitors approaching the front door "is not ascribed to other areas of the curtilage." *Somfleth*, 168 Or App at 425. To the contrary, "entry onto those areas is presumptively a trespass." *Id*. Nonetheless, a homeowner may manifest, "by custom or conduct," implied consent to enter those other areas of the curtilage such that the presumption of trespass is overcome. *Pierce*, 226 Or App at 347. The pertinent question is whether "a member of the public [would] reasonably understand that the property owner has so manifested such consent as to overcome the presumption that entry into the 'nonfront' areas of the curtilage is a trespass." *Id*. at 347-48.

_____

to arrest does not justify a forced entry into the home of the suspect. Such probable cause justifies only the issuance of a warrant. For this reason the application of ORS 133.235(5) would be an unconstitutional application where there are no exigent circumstances."); *Somfleth*, 168 Or App at 424 (A "fundamental principle *** is that intrusions onto residential curtilage are deemed to be trespasses unless the entry is privileged or has defendant's express or implied consent." (Internal quotation marks and brackets omitted.)).

Here, the troopers' conduct exceeded "that which would reasonably be expected of someone approaching the [front] door." *Goldberg*, 309 Or App at 667; *State v. Jackson*, 71 Or App 76, 79, 691 P2d 130 (1984) (officer "left the area in which consent to the presence of strangers is implied" when, after knocking on the front door and receiving no answer, he moved off the front porch towards the side yard). As noted, the troopers stopped and hid behind trees along the edge of the driveway before they approached the house. Further, the evidence establishes that Box did not, by custom or conduct, manifest consent for the troopers' entry apart from approaching the front door. The troopers bypassed the lit front porch at 11:00 p.m. and moved toward the rear patio where multiple cars were parked so as to obscure the view of the rear patio. There was a light on at the workshop, but not in the rear patio, and no trespassing signs were posted. No member of the public would reasonably understand from those circumstances that Box had impliedly invited entry into the rear patio area.

As noted, the trial court determined that, under *Gabbard*, the troopers had implied consent to approach Box in the rear patio area when they saw him walking in that direction. We disagree. In *Gabbard*, two officers drove up the defendant's driveway and parked between the defendant's shed and house. While getting out of the vehicle, the officers noticed that the defendant was coming out of his shed. The defendant and the officers walked toward each other. 129 Or App at 125. We explained that the officers were permitted to walk toward the defendant, rather than to the front door, because "[a]n officer's right to go to the front door of a house is based on implied consent to allow visitors to take reasonable steps to make contact with the occupant." *Id*. at 128. Therefore, "[w]hen defendant came out of the shed, it was no longer necessary for the officers to proceed to the front door. Their decision to go toward defendant, rather than to the front door, was reasonable in [those] circumstances." *Id*. at 128-29.

The factual circumstances in this case materially differ from those in *Gabbard*. In *Gabbard*, the defendant and the officers walked toward each other simultaneously. That is, the defendant saw the officers and manifested his

implied consent for their approach by walking toward them. In contrast, there is no evidence that Box made any gesture or other indication that he consented to making contact with the troopers in his rear patio, as they surveilled from behind the trees. To the contrary, defendant proceeded to go inside his home, and, by the time the troopers approached the rear patio, Box had already disappeared from view.

The trial court also found that Box was aware of the troopers' presence prior to the encounter that led to the shooting. We acknowledge that, viewing the evidence in the record in the light most favorable to defendant, there is at least a disputed issue of fact whether Box was aware of the troopers' presence prior to the encounter. However, that fact is not material to the question of implied consent here. That is, even if Box was aware of the troopers' presence, that fact alone would not be sufficient to overcome the presumption against implied consent to enter the curtilage apart from the approach to the front door. Rather, our case law makes clear that some greater outward manifestation is required. *See Pierce*, 226 Or App at 348-49 (the defendant and his friend did not manifest consent for public to enter backyard by arguing loudly in the backyard at 1:00 a.m., even though it was reasonably foreseeable from that conduct that others would want to contact them there).

In sum, there is no genuine dispute of material fact that the troopers entered areas of the Box property where they lacked authority or consent to be, and, as a result, the troopers were trespassers as a matter of law. Therefore, the trial court erred in denying plaintiff's motion for partial summary judgment and in granting defendant's motion based on its conclusion that the troopers were not trespassers as a matter of law.

We reach the second and third issues next, which relate to defendant's motion for summary judgment, beginning with the issue of apparent authority immunity. For reasons similar to those explained earlier, we conclude that defendant and its troopers do not have immunity for the trespass. Although the troopers may have relied on ORS 133.055(2)(a) in their decision to proceed to the Box property that night, there is no evidence in the record that the

troopers relied on that statute in entering the particular areas of the property, which is the conduct that forms the basis of the trespass claim. And, an interpretation of ORS 133.055(2)(a) that authorized entry into such constitutionally protected areas without a warrant, express or implied consent, or exigent circumstances would not be a plausible interpretation given our established and long held principles prohibiting that conduct. *See Pierce*, 226 Or App at 346-47 ("[B]edrock constitutional principles *** rigorously protect the residential curtilage from warrantless, uninvited intrusions."). As we explained above, we also reject defendant's argument concerning the troopers' reliance on the deadly force statute, ORS 161.239, and any resulting immunity for the shooting itself.

We turn to the third issue, whether there was a dispute of fact as to whether the troopers' trespass caused Box's death. As noted, defendant argues that the trial court correctly granted summary judgment to defendant because plaintiff "offers no analysis of how the alleged trespass caused Mr. Box's death, which plaintiff must show to prevail on its wrongful death action." Plaintiff briefly asserts in her reply that there is "a permissible inference based upon common knowledge and experience that unlawful entry into the curtilage of a home invites violence." Plaintiff also argues that causation can be inferred by "the same evidence that demonstrates that the troopers' failure to maintain cover and distance was a cause of the shooting."

"It is well settled that a landowner is entitled to prove and recover whatever damages are caused by a defendant's trespass." *Sutherlin School Dist. #130 v. Herrera*, 120 Or App 86, 92, 851 P2d 1171 (1993). Under certain circumstances, that may include consequential damages for mental distress and personal injury. *Lunda v. Matthews*, 46 Or App 701, 708, 613 P2d 63 (1980); *Restatement (Second) of Torts* § 162 (1965) ("A trespass on land subjects the trespasser to liability for physical harm to the possessor of the land at the time of the trespass, or to the land or to his things, or to members of his household or to their things, caused by any act done, activity carried on, or condition created by the trespasser, irrespective of whether his conduct is such as

would subject him to liability were he not a trespasser."). However, "both the presence of damage and the causal link between the damage and the trespass [must] be proved with reasonable certainty." *Sutherlin School Dist. #130*, 120 Or App at 92.

We conclude that there is evidence in the summary judgment record sufficient to create an issue of fact as to whether the troopers' trespass caused plaintiff's alleged damages, including the death of Box. As we have explained, direct evidence of causation is not required. Rather, "[c]ircumstantial evidence, expert testimony, or common knowledge may provide a basis from which the causal sequence may be inferred." *Magnuson*, 221 Or App at 268. Here, as with the negligence claim, a reasonable jury could infer that there was a causal link between the troopers' trespass into the curtilage of Box's home and Box's death, because, had the troopers instead approached Box's front door, the encounter would not have resulted in Box's death. *See State v. Ford*, 310 Or 623, 631, 801 P2d 754 (1990) (one reason for "knock and announce" rule is "to protect persons who might be injured by violent resistance to unannounced entries by law enforcement officers"); *Ohling*, 70 Or App at 253 (Approaching the front door of a residence "is so common in this society that, unless there *** [is] evidence of a desire to exclude casual visitors, the person living in the house has impliedly consented to the intrusion. *** Going to the back of the house is a different matter.").

We also disagree with the trial court's conclusion that the troopers' act of stepping behind the trees to surveil the property was "not the basis for damages in this case." That conclusion disregarded plaintiff's theory of trespass— plaintiff contended that the troopers exceeded the scope of implied consent when they stepped behind the trees and when they approached the rear patio. A reasonable jury could conclude that that aspect of the trespass or the entire trespass were causally linked to the damages alleged by plaintiff, including Box's death.

Finally, defendant contends that the trespass was not a cause of Box's death as a matter of law because, as with the negligence claim, "the only possible theory" of causation

for the trespass claim is that the trespass increased the risk that the troopers would use lethal force. We reject that argument for the reasons discussed above. And, in any case, there is sufficient evidence from which to infer a causal link between the troopers acts of trespass and Box's death.

In sum, we conclude that the trial court erred in granting summary judgment to defendant on the negligence claim on the ground of apparent authority immunity. We further conclude that the trial court did not err in concluding that plaintiff's ORCP 47 E declaration created an issue of fact on the element of causation, and we reject defendant's argument that plaintiff is precluded from proving causation as a matter of law. Lastly, we conclude that the troopers were trespassers as a matter of law, and plaintiff was entitled to partial summary judgment on the trespass claim. Therefore, the court erred in denying plaintiff's motion for summary judgment on the trespass claim, and in granting summary judgment to defendant on the ground that the troopers were not trespassers as a matter of law and on the ground of apparent authority immunity. We also reject defendant's argument that plaintiff failed to demonstrate that there was a triable issue of fact whether the troopers' trespass was a cause of Box's death.

Reversed and remanded.